**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRAYSON SMITH, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| RIVIAN AUTOMOTIVE, INC., ROBERT J. SCARINGE, CLAIRE MCDONOUGH, JEFFREY R. BAKER, JITEN BEHL, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, and PAMELA THOMAS-GRAHAM, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Grayson Smith ("Plaintiff"), by and through Plaintiff's counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by Rivian Automotive, Inc. ("Rivian" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class (the "Class") of all persons and entities who purchased Rivian common stock between November 10, 2021 and March 10, 2022, inclusive (the "Class Period"), and all persons and entities who purchased Rivian common stock pursuant and/or traceable to the Registration Statement (defined below) issued in connection with Rivian's November 2021 initial public offering (the "IPO").  This action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Rivian and certain of the Company's officers and directors.

2.      Rivian is a Delaware corporation with principal executive offices in Irvine, California, that designs, develops, and manufactures electric vehicles ("EVs"), including an electric SUV (the "R1S") and an electric pickup truck (the "R1T").

3.      On October 1, 2021, Rivian filed a registration statement for the IPO on Form S-1, which, after several amendments, was declared effective on November 9, 2021 (the "Registration Statement").   On November 9, 2021, Rivian issued the prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.

4.      In connection with the IPO, Rivian offered and sold 175,950,000 shares of its common stock at a price to the public of $78.00 per share, which included the exercise in full by the IPO underwriters of their option to purchase an additional 22,950,000 shares of the Company's common stock.   The gross proceeds to the Company from the IPO were $13,724,100,000, before deducting underwriting discounts and commissions, and estimated offering expenses payable by the Company.

5.      In the Registration Statement, Defendants represented, among other things, that Rivian had 55,400 combined preorders for the R1T and R1S, and that Rivian planned to "produce approximately 1,200 R1Ts and 25 R1Ss and deliver approximately 1,000 R1Ts and 15 R1Ss" by the end of 2021.

6.      In the Registration Statement and throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material

adverse facts, about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Rivian would not meet its 2021 production and delivery targets; (ii) Rivian's vehicles were underpriced and the Company would need to substantially increase prices; and (iii) as a result, Defendants' representations about the Company's business, operations, and prospects lacked a reasonable basis.

7.    The truth about Rivian's production capabilities and business prospects began to emerge on December 16, 2021, when Rivian disclosed that it would fall "a few hundred vehicles short of [its] 2021 production target of 1,200 [vehicles]." In addition to admitting that production was lagging, Defendant Robert J. Scaringe ("Scaringe")—the Company's Founder, Chief Executive Officer, and Chairman—acknowledged that Rivian's vehicles were "very aggressively priced" and that, against "the backdrop of inflation," the Company was "look[ing] at [their] pricing."

8.    On this news, Rivian's stock price fell $11.17 per share, or more than 10%, from a close of $108.87 per share on December 16, 2021, to close at $97.70 per share on December 17, 2021.

9.    On January 10, 2022, Rivian confirmed that it had only "produced 1,015 vehicles by the end of 2021" and that only "920 vehicles were delivered by that date."

10.    Additional corrective information surfaced on March 1, 2022, when Rivian announced that it would dramatically increase the starting price of the R1T by about

17% (to approximately $79,000 from $67,500), and the R1S by about 20% (to approximately $84,500 from $70,000). Notably, these price changes would apply not only to future orders, but also to existing preorders (many of which had been placed as long as three or more years prior). According to Defendant Jiten Behl ("Behl"), the Company's Chief Growth Officer, the price increases were the result of "inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips)."

11.    In a swift and fierce backlash, media outlets reported that many Rivian customers reported that they had cancelled, or planned to cancel, their preorders as a result of the dramatic price hikes.

12.    On this news, Rivian's stock price fell $8.35 per share, or more than 13%, from a close of $61.91 per share on March 1, 2022, to close at $53.56 per share on March 2, 2022.

13.    Just two days later, on March 3, 2022, Defendants retracted aspects of the price increases, now announcing that preorders that had been placed before March 1, 2022, would not be subject to the new prices, and that customers who had cancelled their preorders could reinstate their orders at the original prices. Defendant Scaringe admitted that applying the price increases to existing preorders was "wrong" and "broke [customers'] trust in Rivian."

---

14.    On this news, Rivian's stock price fell an additional $2.65 per share, or approximately 5%, from a close of $53.56 per share on March 2, 2022, to close at $50.91 per share on March 3, 2022.

15.    Then, on March 10, 2022, Rivian announced disappointing financial results for the fourth quarter of fiscal year 2021, including revenue and adjusted losses per share that fell far below analysts' estimates.  Additionally, while analysts had expected Rivian to produce 40,000 vehicles in 2022, Defendants disclosed that the Company expected to produce only 25,000 vehicles in 2022.

16.    On this news, Rivian's stock price fell $3.11 per share, or approximately 7.5%, from a close of $41.16 per share on March 10, 2022, to close at $38.05 per share on March 11, 2022.

17.    Critically, Defendants' December 2021 and March 2022 admissions corroborate allegations raised a week prior to the IPO by Laura Schwab ("Schwab"), a former Rivian executive who had sued the Company for gender discrimination and alleged that senior executives had been warned of production issues and that "it was clear that the [Company's] vehicles were underpriced, and each sale would result in a loss [for] the [C]ompany."  Schwab also alleged in her November 4, 2021 lawsuit that she had reported her pricing concerns to other Rivian executives beginning in the spring of 2021, including Defendant Behl, who initially "brushed her off" but eventually agreed that the Company "would need to raise the vehicle prices after the IPO."

18.     As of the time this Complaint was filed, the price of Rivian common stock continues to trade below the $78.00 per share IPO price, damaging investors.

19.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other members of the Class have suffered significant damages.

## **JURISDICTION AND VENUE**

20.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

22.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1391(b), and Section 22 of the Securities Act, 15 U.S.C. §77v, because Rivian is headquartered in this District, Defendants conduct business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

23.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

24.     Plaintiff purchased Rivian common stock at artificially inflated prices during the Class Period, including common stock traceable to the Registration Statement, and has been damaged thereby.

25.     Defendant Rivian is a Delaware corporation headquartered at 14600 Myford Road, Irvine, California.

26.     Defendant Scaringe is Rivian's Founder and Chief Executive Officer, and is the Chairman of the Company's Board of Directors.  Scaringe signed the Registration Statement.

27.     Defendant Claire McDonough ("McDonough") is Rivian's Chief Financial Officer.  McDonough signed the Registration Statement.

28.     Defendant Jeffrey R. Baker ("Baker") is Rivian's Chief Accounting Officer. Baker signed the Registration Statement.

29.     Defendant Behl is Rivian's Chief Growth Officer.

30.     Defendant Karen Boone ("Boone") is a Rivian Director and signed the Registration Statement.

31.     Defendant Sanford Schwartz ("Schwartz") is a Rivian Director and signed the Registration Statement.

32.     Defendant Rose Marcario ("Marcario") is a Rivian Director and signed the Registration Statement.

33.     Defendant Peter Krawiec ("Krawiec") is a Rivian Director and signed the Registration Statement.

34.     Defendant Jay Flatley ("Flatley") is a Rivian Director and signed the Registration Statement.

35.     Defendant Pamela Thomas-Graham ("Thomas-Graham") is a Rivian Director and signed the Registration Statement.

36.     Scaringe, McDonough, Baker, Behl, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham are collectively referred to as the "Individual Defendants."

37.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Rivian's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse

facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

38.     Rivian and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

39.     Rivian designs, develops, and manufactures EVs, including the R1S and the R1T.

40.     On October 1, 2021, Rivian filed the Registration Statement for the IPO on Form S-1, which, after several amendments, was declared effective on November 9, 2021.  On November 9, 2021, Rivian issued the prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.

41.     Rivian commenced its IPO on or about November 10, 2021, raising more than $13.7 billion (prior to underwriting discounts and commissions, and estimated expenses) from investors by selling 175,950,000 shares of its common stock at a price to the public of $78.00 per share, which included the exercise in full by the IPO underwriters of their option to purchase an additional 22,950,000 shares of the Company's common stock.

## Defendants' Materially False and Misleading Statements

42.     The Registration Statement contained misleading statements of material fact, and omitted material facts required by governing regulations and necessary to make statements in the Registration Statement not misleading.  For example, the Registration Statement specifically touted Rivian's production capabilities and targets, stating:

> In the consumer market, we launched the R1 platform with our first-generation consumer vehicle, the R1T, a two-row five-passenger pickup truck, and began making customer deliveries in September 2021. As of September 30, 2021, we produced 12 R1Ts and delivered 11 R1Ts, and as of October 31, 2021, we produced 180 R1Ts and delivered 156 R1Ts. Nearly all of these vehicles were delivered to Rivian employees, and we expect to ramp deliveries to third-party customers as we increase our production rate. We plan to launch and commence customer deliveries for the R1S, a three-row seven-passenger sports utility vehicle ("SUV") in December 2021 following the completion of ongoing vehicle validation and all required testing. By the end of 2021, we intend to produce approximately 1,200 R1Ts and 25 R1Ss and deliver approximately 1,000 R1Ts and 15 R1Ss.

43.     As a new entrant into the automotive industry, the Registration Statement also acknowledged that Rivian faced the challenge of competing against current and potential manufacturers for sales:

> Both the automobile industry generally, and the EV segment in particular, are highly competitive, and we will be competing for sales with both EV manufacturers and traditional automotive companies. Many of our current and potential competitors may have significantly greater financial, technical, manufacturing, marketing, or other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products than we may devote to our products. We expect competition for EVs to intensify due to increased demand and a regulatory push for alternative fuel vehicles,

continuing globalization, and consolidation in the worldwide automotive industry.

44.     Accordingly, Rivian's ability to achieve success would depend on building a strong brand that encouraged adoption and customer loyalty.  Despite its status as newcomer to the industry, Rivian enjoyed a great deal of excitement in the lead up to its IPO.  An article published in *The Wall Street Journal* on November 9, 2021, noted that Rivian's IPO was "highly anticipated" and that:

> On its roadshow pitch to investors, Rivian's bankers compared the company to electric-vehicle giant Tesla Inc., whose explosive share increase has handed it a market capitalization of more than $1 trillion. Though Rivian is at a much earlier stage, has big losses and had no revenue until very recently, investors were clearly receptive and drawn to the company's growth potential.

45.     To that end, and consistent with Rivian's production targets, the Registration Statement also emphasized the Company's business and growth potential, explaining that:

> Our diverse product portfolio and focus on inspiring people to get out and explore the world positions us to build an enduring brand while addressing a wide range of future mobility and sustainability solutions. Through our base of preorders, we observe strong affinity for our brand which we expect to intensify as brand awareness grows and we welcome new customers to the Rivian community. As of October 31, 2021, we had approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000. We believe the combination of our deep focus on addressing climate change, building compelling products, and delivering a superior customer experience will enable Rivian to drive adoption and customer loyalty, powering our continued growth.

* * *

Based on our current production forecast, we expect to fill our preorder backlog of approximately 55,400 R1 vehicles by the end of 2023. Our manufacturing facility in Normal, Illinois (the "Normal Factory") is currently equipped to produce up to 150,000 vehicles annually (distributed between the R1 platform, which will be used to produce the R1T and R1S, and the RCV platform, which will be used to produce EDVs and other commercial vehicles), when the equipment is operated at full rate and on multiple shifts. The current annual installed capacity for the R1 platform and RCV platform is approximately 65,000 and 85,000 vehicles, respectively. We produced 104 R1T vehicles during the last week of October 2021, representing approximately 8% of our target R1 production rate. Our target is to produce approximately 1,310 R1 vehicles a week, which when annualized (assuming 49.6 working weeks per year), equates to the current installed R1 platform capacity of approximately 65,000 R1 vehicles annually. With respect to the RCV platform, our target is to produce approximately 1,710 commercial vehicles (including EDVs) a week, which when annualized (assuming 49.6 working weeks per year), equates to the current installed RCV platform capacity of approximately 85,000 vehicles annually. We expect our vehicle production rate will improve as we continue to increase the speed of the line, hire and train employees to run additional shifts, commence production of the R1S and EDVs, and increase the rate of purchased materials from our supply chain. We expect to reach a vehicle production rate, which, when annualized, would result in us using 100% of the facility's current installed capacity of up to 150,000 vehicles by late 2023.

46.     The Registration Statement also highlighted factors that would contribute to the Company's success, including Rivian's customer relationships, which, as detailed in the Registration Statement, were an integral part of the Company's business strategy:

**The Rivian Advantage**

We designed all aspects of our ecosystem, business model, offerings, and organization to enable a scalable, customer-centric, and efficient approach, resulting in key competitive advantages.

* * *

- ***Direct Customer Relationships.*** We are a customer-centric organization. Our direct relationships with customers allow us to design solutions that best serve their needs, drive strong engagement, remove structural inefficiencies, create transparency, and increase customer satisfaction and referrals. Our relationships also serve as a medium for establishing a real-time feedback loop, through which we gather valuable data to improve our products and services. By controlling every customer touchpoint from awareness through ownership, we replace a patchwork of third parties with our end-to-end, integrated solutions. We expect to deliver more value to customers along with a superior experience that will generate brand loyalty and increase adoption of our offerings.

47.     Similarly, the Registration Statement noted that the Company's success hinged upon customers' initial experience with the R1T and R1S, stating that these vehicles "are our handshake with the world, the first step in building a relationship with customers" and that Rivian is "focused on ensuring this first experience with a Rivian vehicle creates excitement and passion for our brand."

48.     Likewise, the Registration Statement stated: "Our vehicles occupy an attractive whitespace, addressing large, fast-growing, and high-margin market segments, and are designed to accelerate the large-scale adoption of sustainable transportation. The R1T and R1S introduce our brand to the world and will serve as our flagship vehicles as we continue to expand our offerings."

49.     The Registration Statement reaffirmed these representations by making the following statements concerning Rivian's focus on consumer experience:

**The Rivian Consumer Experience**

Our consumer journey has been holistically designed to create a seamless, end-to-end experience across the vehicle lifecycle, including awareness,

engagement, conversion, delivery, and ownership. As part of this journey, we have developed intuitive digital tools and robust infrastructure to deliver an exceptional experience.

Every aspect of our brand has been developed and is being managed in-house to ensure we create a unique consumer journey that is difficult to replicate. Each step builds on the other, forming a completely integrated and seamless experience for our owners.



### *Awareness*

We generate awareness without sacrificing authenticity. The Rivian brand keeps an honest, approachable, transparent tone and is designed around adventure. We have built our brand and its expressions in-house, spanning creative, marketing, design, digital development, content production, events planning, and analytics. No agencies of record. No paid media. We rely on both shared and earned media to connect directly with our community through engaging content, rich digital experiences, and immersive events. Building awareness organically creates deeper bonds with our community and draws even more people in.

### *Engagement*

Every consumer interaction comes directly from Rivian; whether it is attending an event, subscribing to our digital content, or purchasing one of

our vehicles. We do not rely on third parties or franchisees to engage with our consumers. This one-to-one connection starts at the earliest stages of our relationship, allowing us to form stronger bonds and more deeply understand our consumer. The centerpiece of our engagement approach is our comprehensive demo drive program. Traveling tour events in high-growth regions offer immersive driving experiences while forming connections with our community. To complement our touring drive events, we will also offer at-home drive experiences where we will bring vehicles to individual consumers for a truly personalized, curated experience. By designing our experiences entirely around our consumers we seek to create connection and trust, and a compelling case to move to the next step in the journey with us.

***Conversion***

We have made buying a Rivian vehicle simple, transparent, and easy. There are no dealers to visit or complex, high-pressure sales tactics to endure. We have removed the uncomfortable haggling and unfair leverage typically encountered in the traditional dealership model. Our intuitive online ordering process replaces what otherwise requires several hours at a dealership, with a stress-free experience you can manage in minutes from your couch. Should an issue arise, every consumer has a dedicated Rivian Guide they can call, text, or email directly for help. If a consumer isn't satisfied, we offer the assurance of a hassle-free 7-Day, 1,000- Mile Return Policy. Removing barriers to purchase with helpful, proactive, frictionless shopping tools and customer service results in more willingness to try our brand, including our vehicles, accessories, services, and merchandise.

50.    The Registration Statement also addressed the need to attract and retain a large number of customers:

Our success depends on attracting a large number of potential customers to purchase our vehicles and the associated services we will provide to our customers. As of October 31, 2021, we had accepted preorders for approximately 55,400 R1Ts and R1Ss in the United States and Canada. Preorders are not commitments to purchase our R1T or R1S and are subject to cancelation by customers. If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, or if the final production version of the R1S is not sufficiently

similar to the drivable design prototypes, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.

51.     As to nature of Rivian's preorders, the Registration Statement explained:

Deliveries of the R1T began in September 2021 and deliveries of the R1S are not expected to begin until December 2021, and may occur later or not at all. As a result, we offer waitlist preorders for consumers with a cancellable and fully refundable deposit of $1,000. Deposits paid to preorder the R1T and R1S are cancellable by the customer until the customer enters into a lease or purchase agreement. Because all of our preorders are cancellable, it is possible that a significant number of customers who submitted preorders for our vehicles may not purchase vehicles.

The potentially long wait from the time a preorder is made until the time the vehicle is delivered, and any delays beyond expected wait times, could also impact customer decisions on whether to ultimately make a purchase. Any cancellations could harm our business, prospects, financial condition, results of operations, and cash flows.

52.     At the time of the IPO, the starting prices for the R1T and R1S were $67,500 and $70,000, respectively.  Prior to the IPO, Rivian originally announced base pricing for its R1T pickup truck and R1S SUV at $69,000 and $72,000, respectively.  In December of 2019, Tesla unveiled its Cybertruck with a base price of $39,900.  In a January 26, 2020 article published on the website *Electrek* titled "Rivian will start under expected $69,000 price – Cybertruck effect in action?" it was reported that Rivian adjusted its pricing to compete with Tesla.  According to the article, "Rivian now says that $69,000 will be the price for a 'well-equipped vehicle,' and that base model pricing will actually be lower than that."  The article noted that after federal tax credits for EVs

(which Tesla no longer qualified for), "a new base model Rivian could net out to less than $50,000 all-told. This would be quite impressive and even more disruptive than we originally thought."

53.     The statements set forth in ¶¶ 42-43 and 45-51 were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (i) Rivian would not meet its 2021 production and delivery targets; (ii) Rivian's vehicles were underpriced and the Company would need to substantially increase prices; and (iii) as a result, Defendants' representations about the Company's business, operations, and prospects lacked a reasonable basis.

54.     Additionally, pursuant to Item 303 of SEC Regulation S-K and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

55.     However, the Registration Statement failed to disclose material information regarding known trends and uncertainties pursuant to Item 303.  As alleged herein, the Registration Statement failed to disclose that Rivian would not meet its 2021 production and delivery targets and that Rivian's vehicles were underpriced and the Company

would need to substantially increase prices.  Defendants had a duty to disclose these known trends and uncertainties.  Because the Registration Statement failed to make the requisite disclosures, Defendants violated Item 303.

## The Truth Begins to Emerge

56.    The truth about Rivian's production capabilities and business prospects began to emerge on December 16, 2021, when Rivian announced its first quarterly financial results as a publicly traded company.  In connection with these financial results, Rivian revealed that it "expect[ed] to be a few hundred vehicles short of [its] 2021 production target of 1,200 [vehicles]."  In explaining the shortfall, Defendant Scaringe stated that "ramping up a production system like this [is] a really complex orchestra," and that "ramping up the R1S [production line] in November, while also ramping production of the R1T was more challenging than expected."

57.    Additionally, Defendants admitted that they were considering price increases for their vehicles, with Defendant Scaringe acknowledging that Rivian's vehicles are "very aggressively priced," and that the adjustment of vehicle prices is "something that we've certainly considered and talked about quite a bit as a management team."  When an analyst asked whether the Company was "looking at opportunities to adjust pricing just based on what the demand is for the product," Defendant Scaringe explained that it's "certainly the backdrop of inflation that we're seeing, and a very

strong demand for products . . . broadly within the electrified space has caused us to look at our pricing."

58.    Despite acknowledging production issues and inflationary price pressure, Defendants reassured investors that Rivian's growth prospects were strong.    For example, Defendant Behl explained that the Company continued "to observe strong affinity for our brand, as evidenced by the . . . backlog of preorders."  Specifically, Behl reported that the Company now had approximately 71,000 preorders for the R1T and R1S—a 28% increase in a little over a month since the IPO.  Rivian reiterated that its manufacturing facility "has installed capacity to annually produce 150,000 vehicles" and claimed that the volume of preorders demonstrates that the Company's vehicles "resonate with customers" and "have established the Rivian brand in the most attractive consumer and commercial vehicle market segments."

59.    On this news, Rivian's stock price fell $11.17 per share, or more than 10%, from a close of $108.87 per share on December 16, 2021, to close at $97.70 per share on December 17, 2021.

60.    On January 10, 2022, Rivian confirmed that it had only "produced 1,015 vehicles by the end of 2021" and that only "920 vehicles were delivered by that date."

61.    Additional information correcting Defendants' statements and omissions emerged on March 1, 2022, when Rivian announced that it would dramatically increase the starting price of the R1T by about 17% (to approximately $79,000 from $67,500),

and the R1S by about 20% (to approximately $84,500 from $70,000).  In addition to increasing the starting prices for the R1T and R1S, under the new pricing scheme, vehicle feature "[c]onfigurations that had previously been standard, or the only available option, now cost thousands of dollars extra," such that a customer who preordered a $75,000 vehicle could now be required to pay nearly $100,000 for the same features. Rivian's price increases would apply not only to future orders, but also to existing preorders (many of which had been placed as long as three or more years prior).  At the time of the announcement, Rivian had only produced and sold roughly 1,000 vehicles. Meanwhile, the number of preorders for the R1T and R1S had grown to approximately 71,000 as of December 15, 2021.

62.    In a statement to *Electrek*, Defendant Behl attributed the price increases to inflation and the fact that the prices were originally set in 2018:

> Like most manufacturers, Rivian is being confronted with inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today — prices which were originally set in 2018. This decision will allow us to continue to offer competitive products that maintain the high standard of quality, performance and capabilities that our customers expect and deserve from Rivian. Along with the adjusted prices for our current offerings, we are also announcing Dual-Motor AWD and Standard battery pack options for R1T and R1S, which will provide a broader range of choices for customers as part of our expanding portfolio of options, upgrades and accessories.[1]

---

[1] *See* https://electrek.co/2022/03/01/rivian-prices-increases-many-electric-pickup/ (last visited on Apr. 18, 2022).

63.     However, as discussed in ¶ 52, *supra*, in response to Tesla's unveiling of its Cybertruck, Rivian announced in 2020 that the pricing for the R1T and R1S was actually for a "well-equipped vehicle" and that the base model pricing would be lower.

64.     Moreover, a March 2, 2022 article in the online publication *ARS Technica*, titled "Rivian surprises, outrages EV truck buyers with 20% price hike," questioned the reasons behind the price increases.  The article stated, in part: "While inflation is likely part of the story, the price hike may have been planned for a while. In a lawsuit filed by Laura Schwab, the company's former VP of sales and marketing who alleges the company has a 'toxic' bro culture,' concerns over profitability were raised in spring 2021."  The article quotes from the lawsuit, which was filed in the Superior Court of California for Orange County, on November 4, 2021, just days before the IPO, as follows:

> Beginning in spring of 2021, Ms. Schwab started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors. Shockingly, Mr. Behl dismissed her concerns and explicitly asked Ms. Schwab not to raise these issues in front of Mr. [RJ] Scaringe [Rivian's CEO].

> First, it was clear that the vehicles were underpriced, and each sale would result in a loss for the company. Ms. Schwab ultimately contacted Dennis Lucey, Rivian's Finance Director, and worked with him to develop projections showing how much of a loss the company would incur if Rivian did not raise prices. Ms. Schwab raised this issue with several executives, including Mr. Behl, Stuart Dixon (Director of Product Management), and Andy Zicheck (Principal Product Manager). Mr. Behl brushed her off. Eventually, Mr. [Patrick] Hunt [then-senior director of consumer digital] raised the issue with Mr. Behl, at which point Mr. Behl agreed that they would need to raise the vehicle prices after the IPO.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

65.     Customers who had placed $1,000 refundable deposits for Rivian's vehicles configured to their individual preferences were understandably furious.  Online Rivian forums, social media, and news publications were rife with examples of outrage toward Rivian.  One poster on Rivian's Owner Forum wrote "I'm out. Terrible way to treat early adopters."[2]  Another individual commented:

> My quoted price previously was $75,820 for an R1S and after going through the configurator to get the same vehicle it's $92k. *A 17k increase is not inflation - it means it wasn't priced appropriately to begin with.* Add-in the new 'option' for a dual motor which is positioned as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. *This feels like a gigantic bait and switch.* I may be losing interest at this point as well...[3]

(Emphases added.)

66.     An article published in *Electrek* on March 2, 2022, titled "Rivian buyers are cancelling at alarming rates after price increases," noted that "A poll on the Rivian subreddit, one of the biggest communities of Rivian fans, gives us a better idea of the pulse of the reservation holders, and it shows a high cancelation rate" and provided a screenshot of the poll, which showed a majority of voters planned to cancel their reservations:

---

[2]  *See*  https://www.rivianforums.com/forum/threads/r1t-r1s-updated-pricing-configuration-specs- dual-motor-now-available.3712/page-4#post-102860 (last visited on Apr. 18, 2022).

[3] *See* https://www.rivianownersforum.com/threads/new-email-just-received-important-r1s- pricing-and-product-information.2418/post-22915 (last visited on Apr. 18, 2022).

67.     Additionally, an article published by *Vice* on March 2, 2022, titled "Rivian Jacks Up Vehicle Prices For Preorders Placed Years Ago, Enraging Customers," explained:

> Price increases are obviously a fact of life these days, especially with the car market, a key driver of inflation. But it is rare to see car companies apply price changes, especially such drastic ones, to existing preorders. For example, Tesla regularly changes vehicle prices, but only to new orders. Legacy automakers have been fighting with dealers who are charging much more than the sticker price for electric vehicle preorders, telling them to knock it off.

68.     In response to news of the Company's substantial (and expansive) price increases, Rivian's stock price fell $8.35 per share, or more than 13%, from a close of $61.91 per share on March 1, 2022, to close at $53.56 per share on March 2, 2022.

69.     Facing significant investor and customer backlash, Rivian backtracked just two days later on March 3, 2022, and announced that it would not apply the price increases to preorders that had been placed before March 1, 2022.  Additionally, the Company indicated that it would also allow customers who had cancelled their preorders to reinstate their orders at the original prices.  In announcing these changes, Defendant

Scaringe acknowledged that the extension of the price increases to existing preorders was "wrong" and "broke [customers'] trust in Rivian." Indeed, as explained by an analyst from CFRA Research, "the damage has been done and many customers will be purchasing EVs from competitors instead."

70.     A March 3, 2022 article in *The Wall Street Journal*, titled "EV Startup Rivian Walks Back Price Increase, Apologizes to Customers," shared the following from a now-former Rivian customer:

> Paul Morgan, 39-year-old California resident, expected Rivian's prices to go up a couple thousand dollars to account for inflation. When he received notice that the price on his preordered Rivian SUV would increase $19,000, he drew the line.
>
> "Within five seconds of seeing the new price I clicked the cancel button," Mr. Morgan said. Even after learning that his original price would be honored, he said he didn't reinstate his order.

71.     On this news, Rivian's stock price fell an additional $2.65 per share, or approximately 5%, from a close of $53.56 per share on March 2, 2022, to close at $50.91 per share on March 3, 2022.

72.     Then, on March 10, 2022, Rivian announced disappointing financial results for the fourth quarter of fiscal year 2021, including revenue ($54 million) and adjusted losses ($2.43 per share) that fell far below analysts' estimates. Additionally, while analysts had expected Rivian to produce 40,000 vehicles in 2022 (and Defendants had previously indicated that its manufacturing facility "has installed capacity to annually

produce 150,000 vehicles"), Rivian revealed that it expected to produce only 25,000 vehicles in 2022 "due to the supply chain constraints currently visible to [them]."

73.     On this news, Rivian's stock price fell $3.11 per share, or approximately 7.5%, from a close of $41.16 per share on March 10, 2022, to close at $38.05 per share on March 11, 2022.

74.     Defendants' admissions regarding the production and pricing issues impacting Rivian's operations validate the concerns raised by Schwab with fellow Rivian executives prior to the Company's November 2021 IPO.  As discussed in her November 4, 2021 employment discrimination lawsuit, Schwab raised concerns in pre-IPO planning meetings in September 2021 that "the publicly announced dates for manufacturing and delivery were not achievable," and with Defendant Behl that "the manufacturing process had yet to be refined to a point that the company could confidently assure a consumer of the vehicle's quality, integrity, and safety."  Similarly, Schwab alleged that she raised concerns with several executives, including Defendant Behl, that "it was clear that the vehicles were underpriced, and each sale would result in a loss [for] the [C]ompany."  According to Schwab, Defendant Behl "brushed her off" but later "agreed that they would need to raise the vehicle prices *after the IPO*" when a male executive subsequently raised the same concerns (emphasis added).

75.     Ultimately, the December 2021 and March 2022 corrective disclosures demonstrate that Schwab's pre-IPO concerns were ignored by Defendants until after the IPO was completed.

76.     As of the time this Complaint was filed, the price of Rivian common stock continues to trade below the $78.00 per share IPO price, damaging investors.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

77.     Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class consisting of all persons and entities who purchased Rivian common stock during the Class Period, and all persons and entities who purchased Rivian common stock pursuant and/or traceable to the Registration Statement issued in connection with Rivian's November 2021 IPO.  Excluded from the Class are Defendants, their agents, directors and officers of Rivian, and their families and affiliates.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

79.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants violated the Securities Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

- Whether the prices of Rivian common stock were artificially inflated; and

- The extent of damage sustained by members of the Class and the appropriate measure of damages.

80.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

81.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

83.    Moreover, at all relevant times, the market for Rivian's common stock was an efficient market for the following reasons, among others:

- Rivian's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, Rivian filed periodic public reports with the SEC and the NASDAQ;

- Rivian regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Rivian was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

84.     As a result of the foregoing, the market for Rivian's common stock promptly digested current information regarding Rivian from all publicly available sources and reflected such information in the price of Rivian's common stock. Under these circumstances, all purchasers of Rivian's common stock during the Class Period suffered similar injury through their purchase of Rivian's common stock at artificially inflated prices and the presumption of reliance applies.

85.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

86.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

87.    Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The prices of Rivian's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Rivian common stock during the Class Period and/or pursuant or traceable to the Registration Statement, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

88.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

89.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the Class; and (ii) cause Plaintiff and the Class to purchase Rivian's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

90.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Rivian's common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

91.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Rivian's true condition from the investing public and to support the artificially inflated prices of Rivian's common stock.

93.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rivian's common stock. Plaintiff and the Class would not have purchased Rivian's common stock at the prices

they paid, or at all, had they been aware that the market prices for Rivian's common stock had been artificially inflated by Defendants' fraudulent course of conduct

94.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of Rivian's common stock during the Class Period.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

95.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

96.    The Individual Defendants acted as controlling persons of Rivian within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

97.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

98.     As described above, Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Rivian's common stock during the Class Period.

### <u>COUNT III</u>

**(Violations of Section 11 of the Securities Act Against All Defendants Except Defendant Behl)**

99.     Plaintiff incorporates by reference the allegations in the preceding paragraphs, with the exception that this claim is premised on the remedies available under Section 11 of the Securities Act, 15 U.S.C. § 77k, and expressly excludes and disclaims any allegation that Defendants acted with fraudulent intent or recklessness.

---

100.   The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and/or omitted facts required to be stated therein.

101.   Each of the Defendants named herein is responsible for and are liable for the contents and dissemination of the Registration Statement.

102.   The Individual Defendants (with the exception of Defendant Behl) each signed the Registration Statement and caused it to be declared effective by the SEC.

103.   Rivian is the registrant for the IPO and as issuer of the shares is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Registration Statement.

104.   These Defendants caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of approximately 176 million shares, which shares were purchased by Plaintiff and the Class.

105.   None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material facts required to be stated therein or facts that were necessary to make the statements made therein not false or misleading.

106.   By reason of the conduct herein alleged, each of these Defendants violated Section 11 of the Securities Act.

## COUNT IV

### (Violations of Section 15 of the Securities Act Against the Individual Defendants)

107.    Plaintiff incorporates by reference the allegations in the preceding paragraphs, with the exception that this claim is premised on the remedies available under Section 15 of the Securities Act, 15 U.S.C. § 77o, and expressly excludes and disclaims any allegation that Defendants acted with fraudulent intent or recklessness.

108.    Each of the Individual Defendants was a control person of Rivian by virtue of their position as a director or senior officer with the Company.

109.    By reason of the conduct herein alleged, each Individual Defendant violated Section 15 of the Securities Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: April 19, 2022

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

***Attorney for Plaintiff***